**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

      Plaintiff,                                                   Criminal No. 09-292 JMR/SRN

v.

Abdow Munye Abdow,                                         **REPORT AND RECOMMENDATION**

      Defendant.

_____

      W Anders Folk, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, and Jeffrey Groharing and William Narus, Esqs., United States Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530 for Plaintiff.

      Earl P. Gray, Esq., 332 Minnesota Street, Suite W 1610, Saint Paul, Minnesota 55101, for Defendant.
_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Abdow Munye Abdow's Motion to Suppress Government Interception of Wire or Oral Communication [Doc. No. 37] and Motion to Suppress Evidence [Doc. No. 39].[1]  This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[2]

---

      [1]  At the hearing, Defendant orally withdrew his Motion to Suppress Statements [Doc. No. 38].  Nevertheless, in his post-hearing brief Defendant argues that any statements he made should be suppressed as fruits of the allegedly illegal stop.  As set forth below, because the Court concludes the stop was supported by reasonable suspicion, the statements do not need to be suppressed.

      [2]  The Court has addressed Defendant's non-dispositive motions in a separate Order.

## I.    BACKGROUND

The Government filed an Indictment against Defendant Abdow Munye Abdow ("Abdow") on October 13, 2009, charging Defendant with two counts of Making a Material False Statement to the Federal Bureau of Investigation ("FBI") in violation of 18 U.S.C. § 1001(a)(2) [Doc. No. 5].

This Court held a pre-trial motions hearing on January 12, 2010. Nevada State Troopers Gary Smith and Neil Ferguson testified on behalf of the Government. Defendant Abdow testified at the hearing in his defense. The following exhibits were received in evidence at the hearing:

| | |
|---|---|
| Government's Exhibit 1: | A copy of Nevada Revised Statute § 484.361 prohibiting speeding; |
| Government's Exhibit 2: | CAD (Computer Assisted Dispatch) report dated October 6, 2009; |
| Government's Exhibit 3: | Consent to Search form signed by Abdow dated October 6, 2009; |
| Government's Exhibit 4: | MapQuest map of Las Vegas Metro Area; |
| Government's Exhibit 5: | CD containing recordings related to October 6, 2009 stop; |
| Government's Exhibit 6: | Police Report prepared by Nevada State Trooper Neil Ferguson; |
| Defendant's Exhibit 1: | Written transcript of Gov't. Ex. 5, recording of October 6, 2009 stop; and |
| Defendant's Exhibit 2: | Police Report prepared by Nevada State Trooper Gary Smith. |

This matter is set for trial before United States District Judge James M. Rosenbaum.

## II.   FACTS

The following facts were elicited from the testimony and exhibits introduced at the hearing. Trooper Gary Smith has worked for the Nevada Highway Patrol since January 2007. He has prior law enforcement experience with the Nevada Department of Public Safety working in the parole and probation division and with a Sheriff's Department in California. In addition to his bachelor's degree in criminal justice, Trooper Smith has significant law enforcement training, including specialized courses in interviews and interrogations, defensive tactics and the use of force, drug interdiction, and motorcycle gangs. Trooper Smith is currently assigned to the Interagency Criminal Enforcement (ICE) Team, which works with the Southern Nevada High Intensity Drug Trafficking Area (HIDTA) Taskforce on drug interdiction. Besides the Nevada Department of Public Safety, the other agencies involved with the taskforce include the Las Vegas Metropolitan Police, the Henderson Police Department and the Drug Enforcement Administration (DEA). Based on his experience and training, Trooper Smith testified that the Minneapolis metropolitan area is a "source city" of illicit monies traveling to the south and southwest and a "destination city" for narcotics coming from the south and southwest.

Trooper Neil Ferguson has been employed as a Nevada State Trooper for one and a half years, is a canine handler, and graduated from Winona State University. Prior to working for the Nevada Department of Public Safety, Trooper Ferguson spent 19 years as a Deputy Marshal for the City of Las Vegas. To become a state trooper, Ferguson completed extensive training. He also has specialized training in canine handling, field training, and specifics training. Like Trooper Smith, Trooper Ferguson is assigned to the Southern Command ICE Team focused on drug interdiction.

On October 6, 2009, the troopers were working the 3 p.m. to 1 a.m. shift, in a marked patrol car driven by Trooper Ferguson with Trooper Smith on the passenger side. On that date at approximately 9:17 p.m., the troopers stopped a rental car with Minnesota license plates on south-bound Interstate 15 near mile marker 56, approximately ten miles north of Las Vegas. The troopers testified they stopped the vehicle, a silver Chevy HHR, for speeding at 79 mph in a 75 mph zone, a violation of Nev. Rev. Stat. § 484.61. Trooper Ferguson testified that the target vehicle was measured as speeding at 79 mph based on both the patrol car's rear stationary radar and by pulling behind the Chevy and pacing the vehicle. Trooper Smith testified that he could see Trooper Ferguson was utilizing radar to measure the Chevy's speed, but acknowledged that from the passenger seat he could not see the readout from the radar. Trooper Ferguson testified that he calibrated and tested the radar at the beginning of his shift on October 6, 2009. In their police reports regarding the incident, however, neither trooper mentioned that the Chevy's speed had been measured by radar; the reports only mentioned pacing the Chevy. The troopers followed and paced the vehicle for approximately two miles before pulling the Chevy over.

Defendant Abdow testified at the hearing that the Chevy was not speeding, but rather, the driver had the cruise control set between 73 to 75 mph. However, as a passenger in the vehicle, Abdow did not provide any foundation for his statement that the cruise control was set on the Chevy. Defendant Abdow admitted he did not set the cruise control and did not have a speedometer on the passenger side of the vehicle. On cross-examination in response to questions about his credibility, Abdow took the Fifth Amendment.

Prior to effectuating the stop of the Chevy, the troopers could not see how many total passengers were in the car, nor could they see the race or gender of the vehicle's occupants. The troopers did not make any comments to each other about the number of passengers in the Chevy,

4

or the race or gender of the persons in the vehicle. Trooper Ferguson activated the patrol car's lights and contacted dispatch by radio. The Chevy pulled over to the right side of the highway and the troopers pulled in behind. Trooper Smith remained in the patrol car while Trooper Ferguson exited the vehicle and approached the Chevy on the passenger side.

When Trooper Ferguson approached the vehicle, he asked the Chevy's occupants for identification. In total, there were five passengers in the car. The driver of the car, Mr. Cabdulaahi Faraax, the front-passenger, Defendant Abdow, and one of the rear passengers, Mr. Adam Bonaya Ali, provided Trooper Ferguson with their drivers' licenses, as well as the rental agreement for the car. Trooper Ferguson asked Mr. Faraax to exit the vehicle. Faraax complied and the men walked to a position in the back of the Chevy but in front of the patrol car. Trooper Ferguson gave Trooper Smith the drivers' licenses and rental agreement from the occupants of the Chevy. The troopers indicated it was standard procedure to perform record checks on drivers and passengers in traffic stops in order to verify the driver was legally able to drive, to determine if the vehicle occupants had any outstanding warrants, and to learn about any criminal history of the vehicle occupants that might suggest a threat to the officer's safety or lead to a suspicion of continuing criminal activity. The troopers obtained the rental agreement in order to obtain information about the vehicle's registration and insurance coverage.

At the front of the patrol car, Trooper Ferguson asked Mr. Faraax if he had any weapons on him, to which Faraax replied "no." After a pat-down search, Trooper Ferguson asked Mr. Faraax questions regarding where the group was traveling to and the purpose of their trip. Mr. Faraax answered that the men were traveling to San Diego for a wedding. Trooper Ferguson then asked Mr. Faraax a few follow-up questions about the trip. Mr. Faraax was unable to tell the trooper basic information about the trip, such as who was getting married or where the group

5

was staying. Additionally, Mr. Faraax could not identify all of the occupants of the Chevy. Trooper Ferguson then went to the Chevy to obtain more information from the passengers in the vehicle. The passengers likewise could not tell the trooper the name of the person getting married or where the group was staying. Nor could the passengers state how they knew each other. Because the stories of the passengers conflicted, the suspicions of the troopers were raised about possible criminal activity. The troopers testified that persons involved in criminal activity often use cover stories about the purposes of their travel and then are unable to provide basic follow-up information about the trip. In contrast, persons not involved in criminal activity do not usually have difficulties answering law enforcement officers' questions about their travel.

While Trooper Ferguson asked basic identifying questions of the Chevy's occupants, Trooper Smith sought a record check from dispatch at approximately 9:22 p.m. for the three occupants of the Chevy who had provided identification documents. At approximately 9:27 p.m., dispatch indicated that Trooper Smith should call in on his cell phone, as opposed to the radio. Trooper Smith did so and dispatch advised him that Mr. Faraax and the front-passenger of the vehicle, Defendant Abdow, did not have any criminal history. A passenger in the back of the vehicle, Mr. Ali had a criminal history that included a theft offense. Dispatch also stated that Mr. Faraax was on the FBI's terrorist watch list as possibly being involved in a terrorist organization with a "use caution" notification. This was the first time either trooper had ever received a notification that an individual was on the FBI terrorist watch list. Based on this information, coupled with the information from Trooper Ferguson about the conflicting stories of the passengers, Trooper Smith became increasingly suspicious that the passengers of the Chevy were engaged in criminal activity.

The FBI notification included a phone number, and Trooper Smith hung up with dispatch and called the FBI number. The operator informed the trooper that the FBI was in the intelligence gathering stage regarding Mr. Faraax. Trooper Smith provided the operator with the information about the Chevy, its occupants, and the occupants' story about traveling to San Diego for a wedding. The FBI operator did not instruct Trooper Smith how to proceed with the stop. At approximately 9:43 p.m., Trooper Smith completed the record checks on the Chevy's occupants when he finished his call with the FBI and dispatch.

While Trooper Smith was on the radio with dispatch and on the call with the FBI, he remained in periodic contact with Trooper Ferguson. At some point, Trooper Ferguson indicated he was going to seek consent to search the vehicle. After the phone call with the FBI, and while Trooper Ferguson was still speaking to the passengers of the vehicle, Trooper Smith began completing the Nevada Highway Patrol consent to search form.

After Trooper Smith gave him the consent to search form, Trooper Ferguson returned the identification documents to the men who had provided them. Trooper Ferguson then told Faraax he was receiving a verbal warning for speeding and that the men were free to leave. Next Trooper Ferguson approached the vehicle and asked Abdow if he was willing to get out of the car and answer some more questions. After Abdow complied, Trooper Ferguson gave Abdow the consent to search form. The troopers sought Abdow's consent to search, rather than the consent of the driver of the vehicle, because Abdow was the individual listed on the rental agreement as the party responsible for the vehicle. Abdow read and signed the consent to search form at approximately 9:45 p.m. on the evening of October 6, 2009. At the time Trooper Ferguson sought the consent to search, his weapon was holstered and he did not threaten, coerce or promise Abdow anything in exchange for the consent. Trooper Ferguson also testified that, at

the time Abdow gave his consent to search, he did not appear to be under the influence of any alcohol or drugs and appeared to understand the troopers' questions.

After Abdow signed the consent form, Trooper Ferguson asked Abdow if he had any weapons, narcotics, or large sums of cash with him. Abdow responded that he had $4,000 in cash with him that was "for gifts." The troopers then had all the passengers of the Chevy exit the vehicle so the officers could conduct the search. During the search, the officers found three one-hundred dollar bills on the floor and back seat of the vehicle. Trooper Ferguson asked the individuals who the currency belonged to and one of the individuals stated the money belonged to Abdow. The entire stop lasted approximately one hour.

On October 8, 2009, the FBI questioned Defendant Abdow regarding the Las Vegas trip and the rental of the Chevy. Certain statements made by Abdow on that date are the subject of the Indictment in this case.

## III.   DISCUSSION

Defendant contends that the stop of his Chevy was unconstitutional because the troopers failed to have a reasonable suspicion of criminal activity when they stopped the vehicle. In essence, the Defendant challenges the credibility of the troopers' position that the vehicle was stopped because of a speeding violation. Specifically, Defendant argues, "the troopers' testimonies about the circumstances leading to the stop contain so many inconsistencies and implausibilities that no one could reasonably conclude they were telling the truth when they said Abdow's vehicle was speeding." (Def's Mem. of Law Supporting Mot. to Supp. at 1, hereinafter "Def's Mem."). Defendant further contends that the troopers' real reason for the stop was the vehicle occupants' race, gender and age. (Id.). The Court disagrees and finds the troopers' testimony credible and that the stop was supported by reasonable suspicion.

**A.     The Troopers Had Reasonable Suspicion for the Traffic Stop.**

The Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A traffic stop or investigatory detention constitutes a seizure within the meaning of the Fourth Amendment.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)).  An investigatory detention, which is a brief seizure by police based on a reasonable suspicion of criminal activity, is a narrow exception to the Fourth Amendment's probable cause requirement.  Terry v. Ohio, 392 U.S. 1, 26-27 (1968); United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009).  The officer must have a reasonable, articulable suspicion of criminal activity in order to conduct the investigatory detention, which has become known as a Terry stop.  Id. at 21-22.  The officer may also perform a limited pat-down search for weapons if the officer believes the person is armed and dangerous.  Id.  A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent.  Id. at 21.

Any traffic violation, however minor, creates probable cause to stop a vehicle.  United States v. Binion, 570 F.3d 1034, 1038 (8th Cir. 2009); United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009).  "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  Arciniega, 569 F.3d at 397 (citing Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996)).  Once an officer has probable cause to stop a vehicle, "the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant."  Id. (citing United States v. Bell, 86 F.3d 820, 822 (8th Cir. 1996)).  Likewise, it is also irrelevant that the officer may have ignored the violation if the officer did not suspect the

9

possibility of a greater crime.  Id. (citing United States v. Luna, 368 F.3d 876, 878 (8th Cir. 2004)).  During a lawful traffic stop, it is permissible for an officer to check the driver's license and registration, seek a criminal history, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car.  United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008) (citing United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003)); United States v. Barragan, 379 F.3d 524, 528-29 (8th Cir. 2004).

Based on the court's observations of the witnesses, a review of the witnesses' testimony at the suppression hearing, and a review of the evidence, this Court concludes that the troopers' testimony that the Chevy was speeding is credible, while Defendant Abdow's testimony that the vehicle was not speeding is not credible.  While Defendant makes numerous challenges to the credibility of the troopers' testimony, these arguments are unavailing.

Defendant first contends that the troopers are not credible because Trooper Smith gave inconsistent testimony regarding whether he and Trooper Ferguson discussed why the Chevy should be followed.  Trooper Smith's testimony is not inconsistent.  Rather, Trooper Smith repeatedly stated that he could not recall the exact details of the conversation with Trooper Ferguson before the vehicle was stopped.  When defense counsel asked directly what communications were exchanged between Trooper Ferguson and Trooper Smith before the vehicle was stopped, Trooper Smith did not finish his answer before defense counsel asked another question.  On redirect examination, Trooper Smith stated, "I know we were in communication, I don't recall exactly what was said.  I was informed that the vehicle was travelling in excess of the posted speed limit."  (Transcript at pg. 67, lines 13-15).  Nor is Trooper Smith's testimony inconsistent on the subject of whether the patrol car used radar to measure the Chevy's speed merely because at one point in his testimony he unequivocally stated

10

the radar was on and later used the less definitive phrasing, "I believe so."  Trooper Smith did not testify inconsistently and the troopers had a valid basis to stop the vehicle for speeding.

Defendant also challenges Trooper Smith's testimony that the vehicle was speeding by arguing that, as the passenger in the vehicle, Smith could not see the speedometer or radar and, therefore, did not know firsthand the speed the Chevy was travelling.  Admittedly, the fact that Trooper Smith was on the passenger side of the vehicle means he lacked firsthand knowledge of the vehicle's speed.  However, Smith based his testimony that the vehicle was speeding on his discussion with Trooper Ferguson.  While Trooper Smith's testimony may therefore be hearsay, a "district court may rely on hearsay evidence at a suppression hearing."  United States v. Thompson, 533 F.3d 964, 969 (8th Cir. 2008).  Further, any argument that Trooper Smith's testimony is not credible applies equally to Defendant Abdow, who likewise could not see the speed the Chevy was traveling or the speed of the cruise control.  In contrast, Trooper Ferguson, who as the driver was in a position to see the speedometer of the patrol car and the radar readout, testified repeatedly and consistently that the Chevy was speeding.

Defendant next asserts that the troopers' testimony is not credible because of the lack of documentary evidence corroborating the troopers' alleged reason for the stop.  Defendant first makes much of the fact that the CAD printout never documents the reason the vehicle was stopped.  However, Trooper Ferguson testified that it was uncommon for a CAD report to contain information about the reason a vehicle was stopped. (Transcript at 119-120).  Similarly, Defendant contends that this Court should not believe the troopers' testimony that the officers used radar to verify the Chevy was speeding because neither officer mentioned radar in their police reports.  Even if this Court were to disregard the testimony about the use of radar, both officers credibly testified that they also determined the Chevy was speeding through the use of

11

pacing.   There is nothing in the record contradicting or undermining the testimony that the troopers paced the Chevy at 79 mph.

Many of Defendant's arguments relate to his assertion that the troopers were really interested in stopping vehicles for drug interdiction purposes and thus, this Court should not believe their assertion that the Chevy was speeding.   This argument, however, ignores the established principle that an officer's subjective reasons for a stop are irrelevant as long as the officer has probable cause to stop the vehicle.  Arciniega, 569 F.3d at 397; Whren, 517 U.S. at 813; Bell, 86 F.3d at 822.  Even if the real reason the troopers stopped the Chevy was for drug interdiction purposes, this fact is irrelevant because the troopers had a valid reason to stop the vehicle for a traffic violation.

Similarly, Defendant argues that it is not credible that speeding was the reason the troopers stopped the Chevy because most people on that stretch of highway drive above the speed limit.  Defendant attempts to establish that, in the area the Chevy was stopped, a majority of drivers exceeded the speed limit by offering to supplement the record with a Speed Distribution Report from 2008 by the Nevada Department of Transportation.   The report is irrelevant, however.  Even if it was common for vehicles to speed in that area of the highway, an officer may stop a vehicle for any minor traffic violation, even if the officer may have ignored the violation if he did not suspect the possibility of a greater crime.  Luna, 368 F.3d at 878. Simply because other drivers may have also violated the speed limit does not negate the fact that the officers were entitled to stop the Chevy for the traffic violation.

Finally, Defendant appears to argue that the real reason the Chevy was stopped was because the occupants of the vehicle were black.  (Def's Mem. at 10-11).  Clearly, traffic laws may not be selectively enforced based on race.  Whren, 517 U.S. at 813.  In order to establish

12

discriminatory racial profiling, the defendant must show that similarly situated individuals of a different race were not stopped. United States v. Armstrong, 517 U.S. 456, 465, 116 S. Ct. 1480, 1487 (1996); Poole v. Flanery, No. 05-1650, 162 Fed. Appx. 661, 662, 2006 WL 87610, *1 (8th Cir. Jan. 11, 2006). In the face of the officers' testimony that they did not see the color or race of the Chevy's occupants until the vehicle was stopped, Defendant has offered no evidence to the contrary nor offered any evidence to suggest he was the victim of racial profiling. There is nothing in the record suggesting individuals of a different race or color were not stopped for speeding. Therefore, any suggestion the troopers stopped the Chevy because the occupants were black fails.

The troopers' testimony that the vehicle was stopped for speeding is credible and thus the troopers had a reasonable suspicion to support the stop.

### B.    The Expansion of the Scope of the Stop Was Valid.

Once an officer has stopped a vehicle pursuant to Terry, "[t]he officer may ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop." United States v. McGauley, 786 F.2d 888, 890-91 (8th Cir. 1986); Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984) ("The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detained a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). During an investigatory detention, an officer must employ the least intrusive means of detection reasonably necessary to address the officer's reasonable suspicion. Gill, 513 F.3d at 845; United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999). Asking questions related to the reasonable suspicion and seeking consent to search the vehicle are minimally intrusive and

13

"reasonable and permissible methods of continuing the investigation that [do] not unduly prolong a detention." Gil, 513 F.3d at 845.

An officer may expand the scope of a Terry stop if the officer has reasonable, articulable suspicion that the person is engaged in criminal activity. United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009); United States v. Gil, 513 F.3d 836, 844 (8th Cir. 2008); United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003). To expand the scope of the stop, "[t]he officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Binion, 570 F.3d at 1039 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). In such instances, the officer may then broaden the scope of the stop and satisfy his or her reasonable suspicions without violating the Fourth Amendment, including asking questions unrelated to the original traffic stop. Gil, 513 F.3d at 844; United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008); United States v. Jones, 269 F.3d 919, 926-27 (8th Cir. 2001). Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances. Gil, 513 F.3d at 844; Binion, 570 F.3d at 1039; United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). Officers may question a vehicle's passengers to verify information provided by the driver. Barragan, 379 F.3d at 529. Conflicting stories between a vehicle's occupants can provide justification to expand the scope of the stop. Id.

In this case, the troopers had reasonable, articulable suspicions to expand the scope of the stop. The troopers had information that Mr. Faraax was on the FBI's terrorist watch list. Additionally, the Chevy's occupants could not answer basic questions about the details of their trip and could not even state how they knew one another. The very minimal expansion of the traffic stop was supported by reasonable suspicion.

14

**C.      Defendant Abdow Consented to the Vehicle Search.**

Although Defendant Abdow does not appear to assert that his consent to search the vehicle was not voluntary, for the sake of comprehensiveness, the Court will briefly address the validity of the search.[3]

A search of a vehicle does not violate the Fourth Amendment if it is based on consent or probable cause.  Ballard v. Heineman, 548 F.3d 1132, 1135 (8th Cir. 2008).  Police officers may search an area without a warrant "if they obtain a voluntary consent from someone possessing adequate authority over the area."  United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citing United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).  Whether consent to search was voluntary or was the result of duress or coercion is a question of fact to be determined from the totality of the circumstances.  United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009); United States v. Watters, 572 F.3d 479, 483 (8th Cir. 2009).  The Fourth Amendment only requires that the officer reasonably believe that an individual has given consent to search.  United States v. Guerrero, 374 F.3d 584, 588 (8th Cir. 2004) (quoting United States v. Sanchez, 156 F.3d 875 878 (8th Cir. 1998)).  Whether consent was voluntarily given depends on the totality of the circumstances, including the characteristics of the person and the context of the encounter.  Chaidez, 906 F.2d 377, 380 (citing Bustamonte, 412 U.S. at 226).  The Eighth Circuit has identified a number of factors that a court should consider in determining if consent was voluntary:  (1) the individual's age and mental

---

[3]   The Government asserts that if this Court concluded the initial traffic stop was not supported by reasonable suspicion, the valid consent search purges any taint of the initial stop. First, the Court does not need to reach this issue because the initial stop was indeed supported by reasonable suspicion.  Further, a valid consent search would only cure the taint from evidence seized in the search.  In this case, however, Defendant challenges the FBI's later use of his identification and the rental agreement, which were obtained in the initial stop, not during the search.

ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his Miranda rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. Arciniega, 569 F.3d at 398; United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). No single factor is dispositive or controlling. United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000).

There is no evidence in the record suggesting Abdow's consent to search the vehicle was involuntary. The traffic stop had ended and Trooper Ferguson told the men they were free to leave. The troopers did not use threats, promises or intimidation. The stop occurred on a public highway in front of other traffic. There is no evidence suggesting Defendant was under the influence of alcohol or drugs or that he did not understand the troopers' request for consent to search. Most significantly, Defendant signed the consent to search form which advised Defendant of his rights. Because Defendant Abdow voluntarily consented to the search, any evidence obtained in the search need not be suppressed.

### D. Motion to Suppress Government Interception of Wire or Oral Communication

Defendant has also moved to suppress any communications intercepted by electronic surveillance or wiretap. The Government responded that the Defendant was not intercepted using any form of electronic surveillance or wiretaps in connection with the crimes alleged in the indictment. The motion to suppress should therefore be denied as moot.

16

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's Motion to Suppress Government Interception of Wire or Oral Communication [Doc. No. 37] be **DENIED as moot**;

2.    Defendant's Motion to Suppress Evidence [Doc. No. 39] be **DENIED**; and

3.    That Defendant's Motion to Suppress Statements [Doc. No. 38] be **WITHDRAWN**.


Dated:  February 22, 2010                    s/ Susan Richard Nelson_____
                                             Susan Richard Nelson
                                             U. S. Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **March 9, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.